BEFORE THE THIRD DIVISION, AUGUST 23, 1956

No. 60189.—Joseph Poli Company v. United States, protest 153001–K (Pittsburgh).

DONLON, Judge: The previous submission of this case was set aside by stipulation, and the case has been resubmitted to the third division as now constituted.

The merchandise which is the subject of this protest consists of religious articles, including altar parts, a pulpit, statues, stations of the cross, and a communion rail and steps. All were imported from Italy for installation in churches and chapels in and near Pittsburgh. The importation was in six shipments, each entered separately as duty free. The entries were made by Joseph Poli Company of Pittsburgh, a partnership, as the importer of record. The claim as to all of the items, save one, is that they are duty-free gifts within the provision of paragraph 1774 of the Tariff Act of 1930.

The six entries cover importations during the period between January 1948 and November 1948, both inclusive. By legislation, which became effective on June 12, 1952, the Congress has amended paragraph 1774 so that it is no longer

necessary, as the basis of duty-free entry of religious articles for church use, to establish that such religious articles were "imported in good faith for presentation (without charge)" to a religious corporation or association, as paragraph 1774 theretofore provided. However, the amendment is not retroactive, and such proof is required for importations on the dates when these religious articles were entered. The provision of old paragraph 1774, which governs this case, requires that religious articles, for duty-free entry, be imported for presentation (without charge) to, and for the use of, a corporation or association organized and operated exclusively for religious purposes.

A statue of Our Lady of Fatima is the sole one of these religious articles for which paragraph 1774 exemption is not claimed. This statue was entered as an original sculpture or statuary, and claim is made that it is on the free list under the provision of paragraph 1807.

In accordance with the customs regulations (section 10.51) which governed importations entered under the provisions of old paragraph 1774, effective on the dates when these religious articles were imported, with exemption claimed under that paragraph, the importer filed with each of the six entries a declaration for free entry, in which the importer declared that these religious articles were expressly imported for presentation to religious institutions, severally named in the declaration as to each of the entered articles. With each of these declarations for free entry, there was filed a letter of presentation from the person or persons claimed to be the respective donor or donors, identifying the item that was donated, and also a letter of acceptance, as to each of the articles, from the donee religious institution. All this was procedure then required by customs regulations.

The collector denied free entry. Articles which were in chief value of wood were liquidated as manufactures of wood under paragraph 412 of the Tariff Act of 1930, with duty at 33⅓ percent ad valorem; articles which were in chief value of marble were liquidated as manufactures of marble under paragraph 232 (d) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, with duty at 25 percent ad valorem; and the statuary, including the statue of Our Lady of Fatima, was liquidated as works of art under paragraph 1547 (a) of the Tariff Act of 1930, with duty at 20 percent ad valorem.

The protest before us covers all six entries and makes several claims. After trial, and before submission, plaintiff abandoned all claims, save only the claim for free entry of the religious articles entered, as such, under paragraph 1774 of the Tariff Act of 1930, and the claim for free entry of the statue of Our Lady of Fatima under paragraph 1807 of the Tariff Act of 1930.

We take up first the protest claim as to the items that were entered as religious articles. The issue, as to such articles is whether these articles were "imported in good faith for presentation (without charge)." It appears to be conceded that the respective donees are, in fact, religious corporations or associations organized and operated exclusively for religious purposes. It appears to be conceded also that the articles are, in fact, religious articles. The protest presents for our decision solely the question whether it was these religious articles, in kind, and not merely the money with which to acquire them, which the several donors gave to the respective donee religious institutions.

This is an issue that has been litigated often under paragraph 1774, when it laid down a more exacting standard than now prevails for determining the right to entry of religious articles on the free list. The leading cases, cited in the briefs that have been submitted, are *Don Bernardo Hammerstein* v. *United States*, 27 Cust. Ct. 147, C. D. 1360, and *United States* v. *Dr. Oidtmann Studios, Inc.*, *et al.*, 31 C. C. P. A. (Customs) 116, C. A. D. 260.

In the *Oidtmann Studios* case, *supra*, our appeals court held that the language of old paragraph 1774—

\* \* \* clearly requires that a donor must at the time of importation have such relationship to the imported articles, either directly or by his agent, that he could exercise control over the articles, for without such control they could not be presented by him without charge to a religious organization. (P. 123.)

In the *Hammerstein* case, *supra*, the donor had agreed with the church pastor that the donor would pay for an altar and communion railing. He conferred with the pastor and passed upon designs for the altar and railing. The pastor sought and received the donor's approval of designs before the pastor proceeded to conclude the purchase and arrange for importation and installation. After importation, and when the work of installation was satisfactorily advanced, the donor paid to the pastor a sum of money that was sufficient to cover the cost of the imported altar and communion railing and their installation. On this record, in the *Hammerstein* case, we found that the donor had conducted himself as one who sought to obtain and to present, as a gift, particular religious articles; and that, in law, he had given not a sum of money, but the very imported religious articles which were installed according to the designs he selected.

The holding in the *Hammerstein* case is, of course, wholly consistent with the test that was laid down by our appeals court in the *Oidtmann Studios* case.

Only one witness testified at the trial. Mr. Henry Poli, a partner of Joseph Poli Company, testified for the plaintiff. He said that his firm are architects and contractors in religious installations and that they had various responsibilities, as stated in his testimony, in connection with the design, importation, and installation of all of the articles which are covered by this protest.

There is also in the record the deposition of Professor Spartaco Palla, who described himself as an industrial sculptor. His testimony was taken in response to written interrogatories, by the consul of the United States of America in Florence, Italy, acting as a commissioner of this court. Professor Palla's testimony relates solely to the works-of-art issue, as he was the sculptor. This is the statue that was entered, not as a religious article, but as an original statue or statuary.

The alleged donors and donees of the religious articles are so numerous, and there is such a commingling of articles in the several entries, that the record is understandably confused. However, plaintiff has to overcome the presumption of correctness attaching to the collector's liquidation of each separate article that is protested. This burden of proof has been differently met as to different items. It, therefore, becomes necessary for us to weigh separately plaintiff's proofs as to each of the six entries included within the protest before us.

Entry 0112, January 29, 1948, relates to parts of wood altars that were imported for and installed in the Convent of Our Lady of the Sacred Heart at Coraopolis, Pa., pursuant to an agreement between the mother superior and the plaintiff, which is dated December 3, 1947. This agreement was admitted in evidence and is exhibit 1. This agreement, signed only by the mother superior, recites that the imported parts of wood altars are donated to the Convent by the "Ladies Auxiliary" and by "Mr. and Mrs. V. C. Kolski." The sum due for the altars and their installation, as provided in this agreement, was $2,100.

Relative to entry 0112, there was also put in evidence a letter of presentation, signed by Mrs. F. Biedzinska as president of the ladies auxiliary and by a single signature as "Mr. and Mrs. V. C. Kolski," addressed to the mother superior of the convent. This is plaintiff's exhibit 2. It is dated November 21, 1947.

The weight to be given to this letter of presentation, as proof of the facts recited, is an issue for us to consider. *United States* v. *Borgfeldt & Co.*, 11 Ct. Cust. Appls.

129, T. D. 38934; *Borgfeldt & Co.* v. *United States*, 11 Ct. Cust. Appls. 421, T. D. 39433.

It should be noted that the letter of presentation antedates the written agreement, and both antedate the importation. Together with the direct testimony of Mr. Poli, the record indicates that the mother superior had a firm commitment of the named donors to donate the altar parts and to install them, before she concluded with the plaintiff the transaction of purchase and the arrangements for importation and installation. Mr. Poli also testified that he submitted drawings of the altars, prior to importation, and that these drawings were approved both by the mother superior and by the donors. Payment of the contract sum of $2,100 was made to plaintiff by the mother superior, and the testimony is that Mr. and Mrs. Kolski paid $2,000 of this amount. There is no testimony as to what share the ladies' auxiliary had in the transaction, but the unaccounted balance is only $100, and the record is clear that the ladies' auxiliary were codonors of an unnamed share.

Defendant argues that the facts of record show the entered value of the imported altar parts as $1,039 and that, therefore, since Mr. and Mrs. Kolski alone gave $2,000, the evidence does not show that the religious articles were donated, as old paragraph 1774 required. However, the affidavits in evidence, supported as they are by testimony showing action on the part of the claimed donors that is consistent both with donation of the articles and arrangements for their installation in the convent chapel, present a record that, in our opinion, overcomes the presumption of correctness attaching to the collector's liquidation.

Defendant introduced no testimony, and nothing developed on cross-examination of plaintiff's witness contradicts, or is inconsistent with, the case established by plaintiff for classification of the wood altar parts, entry 0112, as duty free under paragraph 1774. *United States* v. *Edson Keith & Co.*, 5 Ct. Cust. Appls. 82, T. D. 34128.

Entry 244, November 24, 1948, relates to 14 stations of the cross and also certain statues of St. Joseph, the Blessed Virgin, and St. Anthony and Child. At the trial, plaintiff abandoned its claim as to the statue of St. Anthony and Child. The remaining issues before us, under this entry, are as to the stations of the cross and the statues of St. Joseph and of the Blessed Virgin.

The stations of the cross were imported for and installed in St. Peter's Church, Pittsburgh. The statues were imported for and installed in the chapel of St. Mary's Convent, also in Pittsburgh.

There is some testimony that each station of the cross bears a plaque, but the evidence is not clear as to how these plaques are inscribed or what evidence such inscription affords as to the litigated issue. There is, in the record, a letter of presentation of the stations of the cross to St. Peter's Church, dated September 24, 1948. This is exhibit 14. The letter is signed by three individuals named as donors, but there is no evidence linking them with whatever names are inscribed on the plaques.

The statues of St. Joseph and of the Blessed Virgin, according to testimony and a letter of presentation, dated November 19, 1948 (exhibit 15), were donated to St. Mary's Convent by Mrs. Elizabeth H. Moore. The contractor billed Mrs. Moore for these statues, and she paid the bill through the mother superior of St. Mary's Convent. Nameplates are attached to each of these two statues, bearing the name of Mrs. Moore's parents.

The record as to this entry establishes that the two statues were donated within the meaning of paragraph 1774. The evidence as to the stations of the

cross, a part of entry 244, is insufficient to overcome the presumption of correctness attaching to the collector's action.

Entry 039, September 29, 1948, includes a marble altar, marble pulpit, and a green marble base for an altar. All were entered as duty free under paragraph 1774, but were liquidated by the collector as manufactures of marble under paragraph 232 (d) of the Tariff Act of 1930.

As to the green marble base for an altar, no proof was offered to overcome the presumption of correctness attaching to the collector's liquidation. Accordingly, the protest claim as to that item fails for lack of proof.

The marble altar and marble pulpit were installed in St. Peter's Church, Pittsburgh. They bear the names, on a plaque or plate, of several people whom Mr. Poli identified by name as the donors of the altar and pulpit. The names appearing as signatory to several letters of presentation of the altar and pulpit, all dated June 24, 1948, and in evidence as exhibit 13, are those of the persons who were identified by Mr. Poli as donors of the altar and pulpit. Defendant offered no evidence on this issue.

In our opinion, plaintiff has sustained its burden of proof with respect to the marble altar and marble pulpit, but not with respect to the green marble altar base, covered by entry 039.

Entry 01, July 1, 1948, covers a marble communion rail and step, imported for and installed in the chapel of Mt. Assisi Academy in Pittsburgh. The letter of presentation, verified April 3, 1948, was received in evidence (exhibit 8) over defendant's objection. Statements contained in an affidavit which is received in evidence, without objection, may be considered by this court. *United States* v. *Borgfeldt & Co.*, 11 Ct. Cust. Appls. 129, T. D. 38934. However, where objection is made to the introduction of an affidavit, it is not competent evidence before this court as to any of the statements contained therein, without some substantiating proofs. Here, there are none. *Eidlitz & Son (Inc.), as Agent* v. *United States*, 12 Ct. Cust. Appls. 56, T. D. 39998.

Plaintiff's witness said he did not know and had never met the alleged donors of this marble communion rail and steps. The contract pursuant to which they were said to be imported and installed (exhibit A) is a general contract for miscellaneous work. Although clause 8 of the contract contemplates that the railing and step will be donated, nowhere in that document are the donors identified. The bill, marked paid, dated September 28, 1948 (exhibit 9), is of little or no probative value on the litigated issue, as it likewise fails to identify the alleged donors. Plaintiff has failed to overcome the presumption that the collector's classification is correct as to the items imported under entry 01.

Entry 667, March 31, 1948, includes several different items. As described in the entry, there were seven marble statues, one marble statue and marble hands, manufactures of wood, two original statues, and four plaster casts.

On trial, plaintiff offered evidence only with respect to six of the statues. From the testimony of record and descriptions in the invoices, these six statues are identifiable as follows: Statues of Our Lord Jesus, of Our Lady, of St. Joseph, and of St. Therese, all installed in the Church of the Assumption at Bellevue, Pittsburgh; and statues of Our Lady of Lourdes and of Bernadette, installed in St. Peter's Church, Pittsburgh. Claim as to other items under this entry is deemed abandoned by plaintiff for failure to offer proofs and, accordingly, only the six statues as to which proofs were introduced are here considered.

The four statues for the Church of the Assumption were installed under a contract between Joseph Poli Company and the church. This contract is in

evidence (exhibit 4). It is dated November 25, 1946, and provided for installation of two side altars, one to take the statue of Our Lady (Blessed Virgin) and the other to take the statue of Our Lord Jesus (Sacred Heart). The total price of the statues and work was $9,800, to be paid as follows: $4,800 on delivery of material to the church, as approved by the architect, and the balance of $5,000 upon completion of the installations. The contract was later modified by an agreement, dated December 10, 1946 (exhibit 5), providing for installation also of two additional statues, namely, the statues of St. Joseph and of St. Therese, at an additional cost of $1,000. The agreement, as modified, contained specific instructions as to the place of installation of these statues. Neither the original nor the amended agreement recites any donation of the articles.

A letter of presentation, dated February 24, 1947, was offered in evidence by defendant and was accepted, without objection by plaintiff. This letter bears the signatures of six different people as donors of the four statues.

Evidence is clear that $6,000 (exhibit 6, receipt for payment) was paid directly to Joseph Poli Company by Mr. F. W. Ries, Jr., in part payment of the contract price, aggregating (as amended) $10,800. Mr. Poli testified that, of this sum, $6,000 was paid by Mr. Ries for the four statues here under consideration, plus the altars imported under another entry, which is not before us in this protest. Mr. Poli testified that he met Mr. Ries, in company of the church pastor, to discuss the importation and installation of the statues.

However, the name of this alleged donor, Mr. F. W. Ries, Jr., does not appear as one of the donors in the letter of presentation. No other evidence in this case identifies Mr. Ries either as the donor or as one of the donors of the four statues. Mr. Poli, on cross-examination, seemed to concede that his knowledge with respect to the relationship of Mr. Ries as donor was not clear.

We are of opinion that, as to these four statues, plaintiff has failed to sustain its burden of proof.

The record as to the statues of Our Lady of Lourdes and of St. Bernadette, a part of entry 667, is likewise not clear. It does not appear that there was a written contract for their installation in St. Peter's Church. The statue of Our Lady of Lourdes bears a plaque inscribed with the name "Mr. and Mrs. Michael LoPinto." The statue of St. Bernadette has a plaque inscribed "Children of Maria Schipini." These two statues, and how they were to be placed in the church, were discussed by Mr. Poli with Mr. and Mrs. LoPinto and with the children of Maria Schipini, in the presence of the church pastor. Payment for these statues was made by the pastor, after the installation.

In evidence as exhibit 7 is a letter of presentation filed with the entry of the statues of Our Lady of Lourdes and of St. Bernadette. This letter bears the name of a donor, Mrs. D. McCarthy, in addition to Mrs. M. LoPinto. There is no reference in this letter to the children of Maria Schipini. Although an inscribed plaque on a statue is some evidence of donation of that article by those named in the inscription, it is not conclusive proof of donation of the article, within the meaning of paragraph 1774. The inconsistency as to donors between the plaques and the letter of presentation was not satisfactorily cleared up, except for the statement of Mr. Poli that two families, the LoPinto and McCarthy families, donated the statue of Our Lady of Lourdes, and that one family, presumably, but not stated to be, the Schipini family, donated the statue of St. Bernadette. Mr. Poli, the sole witness, testified to no facts in support of these statements. The record, therefore, fails to support the protest claim as to these articles.

Entry 72, August 23, 1948, covers merchandise described in the invoice as a statue of Our Lady of Fatima; statue of Our Lady of Lourdes; statue of St. Bernadette; marble group of Pieta; plaster cast of St. Philomena; and several cans of pure olive oil. No claim is made as to the plaster cast of St. Philomena or the cans of olive oil.

The statues, which comprise the other articles imported under this entry, were assessed for duty as works of art under paragraph 1547 (a) of the tariff act at 20 percent ad valorem. Free entry under paragraph 1774 is claimed for the statues of Our Lady ofLourdes and of St. Bernadette and for the marble group of Pieta. The statue of Our Lady of Fatima is claimed free of duty as an original sculpture or statuary under paragraph 1807.

The statues of Our Lady of Lourdes and of St. Bernadette were installed in the Regina Coeli Church in Pittsburgh. Plaintiff's witness, Mr. Poli, had no recollection as to the donors of these statues, if there were any donors. Defendant took exception to the verified letter of presentation, dated March 9, 1948, filed with entry of these items, which was offered and received in evidence (exhibit 10). This letter is not competent evidence to prove the facts stated therein, over defendant's objection. `Eidlitz & Son (Inc.), as Agent v. United States, supra.

The marble group of Pieta was installed in St. Peter's Church in Pittsburgh. Plaintiff's witness, Mr. Poli, was positive in his identification of the donor of this article, and his testimony confirms statements in a letter of presentation, verified August 3, 1948, which was received in evidence without objection (exhibit 11). The letter is signed by the persons who are identified by Mr. Poli as donors. The donors conferred with the pastor and Mr. Poli and offered suggestions as to placement of the marble group of Pieta. A plaque is attached, and the inscription is prefaced with the words "gift of." Defendant offered no proofs. In our opinion, plaintiff has sustained the burden of proof for free entry under paragraph 1774 .of the marble group of Pieta.

The statue of Our Lady of Fatima is the last item for consideration. Plaintiff claims that this statue is an original sculpture or statuary, entitled to free entry under paragraph 1807. The test of originality laid down under paragraph 1807 is whether or not the artist exercised his own esthetic imagination and conception in creating the work. Forest Lawn Memorial-Park v. United States, 29 Cust. Ct. 224, C. D. 1472. The testimony indicates that Joseph Poli Company sent a description of the statue to Mr. Palla, a sculptor in Italy. The description incorporated special features which were desired in the statue. A deposition of Mr. Palla, taken abroad, is in evidence (exhibit 12). It suffices to quote here the interrogatories and replies following Mr. Palla's affirmative reply to plaintiff's question 7, identifying Our Lady of Fatima as one of a group of statues.

8. Q. If your answer to question 7 is in the affirmative, please identify which, if any thereof, are of your own professional production?—A. All of the items listed in Question No. 7 are of my own professional production.

9. Q. Are each of the items identified as your own professional production in answer to question 8, of your own conception and creation?—A. No. Not all of them.

10. Q. Of the items identified in your answer to question 8 as your own professional productions, please state which thereof, if any, are original works, and which thereof, if any, are first or second replicas or reproductions of original works produced by you?—A. Of the items listed, the following are original works:

Statue of St. Anthony and Child, shipped on the SS President Filmore, Invoice No. 4665, dated October 11, 1948,

Our Lady of Fathima [*sic*] Group with children and lambs, shipped on SS Exochorda, Consular Invoice No. 3725, dated June 15, 1950,

Memorial Relief, shipped on SS Exochorda, Consular Invoice No. 2536, dated May 19, 1949.

I cannot state positively whether any of the other items are first or second replicas of original works produced by me.

I cannot state whether any of the other items listed are reproductions of original works produced by me.

The statue of Our Lady of Fatima referred to in the above testimony is not the statue of Our Lady of Fatima that is here before us. This statue was shipped, not on the SS Exochorda, consular invoice No. 3725, dated June 15, 1950, but on the SS Marine Flier, consular invoice No. 3130, dated July 20, 1948. The consular invoice was accompanied by the sculptor's declaration of entry under paragraph 1547, which contains a dutiable provision for works of art. Paragraph 1547 is not the duty-free provision for original sculpture. That is paragraph 1807, under which provision plaintiff claims free entry of this statue. In other words, the collector liquidated the entry of this statue on the basis set up in the consular invoice and accompanying papers from Italy, but not on the basis claimed in the entry.

Even the sculptor does not include this statue as one of his statues, which he claims are original sculptures or statuary. The plaintiff has not overcome the presumption of correctness attaching to the collector's liquidation.

Former paragraph 1774 imposed on importers of religious articles a heavy burden of proof, which, in this case, has been borne unevenly as to the numerous articles involved in the six entries that are protested.

The protest is sustained as to the following identified articles under the pertinent entries:

| Articles | Entry | Date |
|---|---|---|
| Two cases, wood altars | 0112 | January 29, 1948 |
| Statue of St. Joseph | 244 | November 24, 1948 |
| Statue of Blessed Virgin | 244 | November 24, 1948 |
| Marble altar and pulpit | 039 | September 29, 1948 |
| Marble group of Pieta | 72 | August 23, 1948 |

In other respects, and as to all other merchandise, the protest is overruled. Judgment will be rendered accordingly.

## DISSENTING OPINION

JOHNSON, Judge: In this case, the principal claim is that certain imported articles, such as altar parts, a pulpit, statues, stations of the cross, and a communion rail and steps, are entitled to free entry under paragraph 1774 of the Tariff Act of 1930 as articles imported for presentation (without charge) to, and for the use of, corporations organized and operated exclusively for religious purposes. One item is claimed to be entitled to free entry under paragraph 1807 as an original sculpture. The decision of my colleagues overrules the claims as to most of the articles involved, but has allowed free entry under paragraph 1774 as to the following items:

| | |
|---|---|
| Wood altars | Entry No. 0112 |
| Statue of St. Joseph | Entry No. 244 |
| Statue of Blessed Virgin | Entry No. 244 |
| Marble altar and pulpit | Entry No. 039 |
| Marble group of Pieta | Entry No. 72 |

In my view, however, the evidence is insufficient to sustain the claim as to any of the imported articles.

The pertinent paragraph of the tariff act, as it appeared prior to its amendment (which is not applicable to the instant merchandise), provided:

PAR. 1774. Altars, pulpits, communion tables, baptismal fonts, shrines, or parts of any of the foregoing, and statuary (except casts of plaster of Paris, or of compositions of paper or papier-mâché), imported in good faith for presentation (without charge) to, and for the use of, any corporation or association organized and operated exclusively for religious purposes.

The statute was construed in *United States* v. *Dr. Oidtmann Studios, Inc.*, 31 C. C. P. A. (Customs) 116, C. A. D. 260, wherein the court said (p. 123):

* * * Congress in clear and unambiguous language provided in paragraph 1774 that to come within its provisions the articles therein named must have been imported "in good faith for presentation (without charge)" to a religious organization. This language clearly requires that a donor must at the time of importation have such relationship to the imported articles, either directly or by his agent, that he could *exercise control over the articles*, for without such control they could not be presented by him without charge to a religious organization. [Italics supplied.]

In that case, there was a contract between Dr. Oidtmann Studios and the congregation of the St. Louis Cathedral for the purchase and installation of the structural parts of a main altar and two side altars. There was in evidence a letter signed by Father Anderson presenting the altars to the cathedral. According to Father Anderson's testimony, he was asked to make a donation and agreed to do so, provided a tablet were put up in honor of Bishop Laval. He donated the money, with which the cathedral paid the studios. The court held that Father Anderson had made a donation of money, not altars; that he had never had title to, possession of, nor dominion over the imported articles and could not have made a presentation of them to the cathedral without charge.

Free entry was allowed in the case of *Don Bernardo Hammerstein* v. *United States*, 27 Cust. Ct. 147, C. D. 1360, where it appeared that the donor authorized the pastor of the church to act for him; conferences were had between the pastor and the donor every week; the donor passed upon the designs; the pastor received his approval before proceeding with each step; the money was not turned over to the pastor to pay for the articles until the work was well advanced.

In a more recent case, *Westfeldt Brothers* v. *United States*, 36 Cust. Ct. 112, C. D. 1760, free entry was not allowed where it appeared that the contract of purchase of the articles was made by the bishop and could not have been canceled without his consent; payment was made upon completion of the work to his satisfaction; while the chancellor had been appointed agent of the donors, his only authority was to collect funds and pay for the work; neither the donors nor the chancellor had title to, possession of, nor dominion over the imported articles.

The articles covered by entry No. 0112 consist of wood altars, imported from Italy on or about January 6, 1948. Henry Peter Poli, an architect and a partner in the firm of Joseph Poli Company, testified that the transaction originated in that the mother superior of Our Lady of the Sacred Heart Convent, Coraopolis, Pa., had a painting which she wished placed in a shrine. He said that "she had a *donor who would furnish the funds* for carrying out this transaction" [italics supplied] and that she asked the witness to make a drawing for the shrine. He stated that several conferences were had, at which time he even met the donors, Mr. and Mrs. Kolski. Other than Coraopolis, he did not know their address.

The drawings were approved in a conference, at which the mother superior and the donors were present, and Poli sent to Italy for the articles. Mr. Poli said the Kolskis suggested changes in the drawings, but he did not state what they were nor whether or not they were made. In a letter to the mother superior, dated November 21, 1947, signed by Mr. and Mrs. Kolski and by the ladies auxiliary by Mrs. F. Biedzinska, president, it is stated that the undersigned take pleasure in presenting to the convent the altar and shrine, "which we have asked the Joseph Poli Company to import from Italy." In a letter from said company to the convent, dated December 3, 1947, it is stated that the company agrees to furnish and install the altar and frame for the shrine, "the imported portions of which are being donated by the ladies auxiliary and by Mr. and Mrs. V. C. Kolski." Mr. Poli testified that he received his authority from the convent and that the convent paid the contract price of $2,100. At a conference at which the Kolskis were present, they said "they would stand $2,000 of it."

The evidence is insufficient to establish that the Kolskis ever had control over the articles, or even that they had final approval of the designs. The mother superior engaged Poli and had him submit drawings. There is no evidence that the Kolskis selected him. He met them at the conferences, and they made some suggestions, but there is nothing to show that their suggestions were adopted. There is no evidence that any representative of the ladies auxiliary was present at any of the conferences or had anything to do with the designs or the articles themselves. Apparently, all that that organization did was to donate a sum of money.

In my view, this evidence does not meet the requirements of the statute. It establishes no more than that the donors gave the money and that two of them, Mr. and Mrs. Kolski, knew what was being done with it. The only evidence which even tends to indicate that the donors had anything to do with the importation of the merchandise is the letter of presentation, which refers to the altar and shrine, "which we have asked the Joseph Poli Company to import from Italy." This letter has little or no value as evidence that the donors imported the merchandise. It is to be noted that similar letters are in evidence as to some of the other imported articles and that the word "we" is used even where there is only one donor. Evidently, they were all prepared by the same person and given to the donors for signature.

The Joseph Poli Company was selected for the transaction by the mother superior; its agreement was with the convent; and it was paid by the convent. There is no evidence that it was paid by the donors, either for the merchandise or for acting as their agent in importing it. The witness, a partner in the company, did not even know the address of the principal donors. Under these circumstances, and for the purpose of proving agency, insofar as it affects a third party, the statement in the letter of presentation does not establish that the company was, in fact, acting as agent of the donors in importing the merchandise. *Eidlitz & Son (Inc.), as Agent* v. *United States*, 12 Ct. Cust. Appls. 56, T. D. 39998.

The evidence herein does not support the claim that the donors imported the articles for presentation to the convent or that they ever had title to, possession of, or dominion over such articles.

As to the statues of St. Joseph and the Immaculate Conception in entry No. 244, there is in evidence a letter to the chaplain of St. Mary's Convent, Pittsburgh, signed by Elizabeth Harris Moore, stating that the undersigned takes pleasure in presenting to the chapel of the convent the articles "which we [*sic*] have asked the Joseph Poli Company to import from Italy." According to Mr.

Poli's testimony, he made an agreement with the convent for $900 for the two statues that were installed in the chapel. At the direction of the convent, he sent the bill to Mrs. Moore, who forwarded her check to Mother Francella at the convent. The convent sent its check to Poli. The type of statue that was purchased was designated by the mother superior, to whom photographs were shown. The witness stated that "Mrs. Moore was in on it," but that the mother superior picked the statue. Nameplates were placed under these statues in the name of Mr. and Mrs. Frank J. Harris, the parents of Mrs. Moore.

The items involved in entry No. 039 were a small altar and pulpit for St. Peter's Church in Pittsburgh. There is in evidence a letter, dated June 24, 1948, addressed to the pastor of the church, signed by Sully or Sally Nesta, Mrs. A. Marinpietre and Mrs. F. Marinpietre, stating that the undersigned take pleasure in presenting the marble altar, "which we have asked the Joseph Poli Company to import from Italy." A similar letter signed by John Nesta refers to the marble pulpit. Mr. Poli testified that he met the Nestas and the Marinpietres in the presence of Father Costa and discussed with them "the places of the installations of the statues [sic]." He said that the pastor had the "final disposition rights" and that he (the pastor) paid for the work in behalf of the church.

One of the items in entry No. 72 was a marble statue, called Pieta. There was received in evidence a letter, sworn to August 3, 1948, signed by Mrs. M. L. Raggio and John and Pellegrino Raggio, stating that they take pleasure in presenting to St. Peter's Church, one marble Pieta "which we have asked the Joseph Poli Company to import from Italy." Mr. Poli testified that he had met the Raggios in the presence of Father Costa. He stated:

A. This particular one I remember, because we had a question as to where to place this statue of the Pieta, and they offered their idea. The father offered his and I offered mine, and we decided where it now stands.

\* \* \* \* \* \* \* \*

R. X Q. In those situations who is the one whose opinion prevails, or in other words, who has the last say?—A. Well, you are trying to please the Pastor.

R. X Q. Isn't the Pastor to decide where it goes after listening to everything?—A. Yes.

The witness also testified that the donors of the money asked that plaques be placed on the statue, stating "gift of." He stated that the money was paid to him "by the church, by the pastor." He did not know whether the church received it from the donors or not.

In my view, none of the evidence summarized above is sufficient to establish that the donors had any control over the articles or that they, in fact, imported them for presentation to the religious institutions involved. They made a gift of money, not the articles. They evidently had knowledge of what was being done with the funds and may have made some suggestions in regard to the articles or their installation, but they did not have title to, possession of, nor dominion over the imported articles.

For the reasons stated, the protest herein should be overruled as to the above five articles, as well as the other imported articles as to which the majority opinion has denied free entry.